UNITED STATES

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

THE COMMUNITY PRESERVATION CORPORATION,

Plaintiff,

- against -

1974 REALTY ASSOCIATES,

Defendant.

ORIGINAL

Index No. 21023/02

**NOTICE OF CROSS-MOTION**

1974 REALTY ASSOCIATES,

Third-Party Plaintiff,

- against -

CORNICK GARBER & SANDLER LLP,

Third-Party Defendant.

KINGS COUNTY CLERKS
OFFICE
$ 45.00 FEE PAID

DISMISS

**PLEASE TAKE NOTICE**, that upon the annexed affidavits of Elizabeth Crane, sworn to May 11, 2005, and Jonathan Poole, sworn to May 13, 2005, and the accompanying documentary supplement, the undersigned will cross-move this Court, in the Part 52 of this Court, Room 357 at the Courthouse located at 360 Adams Street, New York, County of Kings on the 3rd day of June, 2005 at 9:30 o'clock in the forenoon of that day or as soon thereafter as counsel can be heard, for an Order (i) pursuant to CPLR 3211(e), dismissing the complaint on the ground that the Court lacks jurisdiction over defendant, or in the alternative; (ii) pursuant to CPLR 3215 (c), dismissing the complaint as abandoned and (iii) for such other and further relief

KINGS COUNTY
SUPREME COURT
MOTION SUPPORT
APPROVED
DATE 5-19-05 9C

as to this Court may seem just and proper.

Dated: New York, New York
       May 13, 2005

                                             By: Andrea L. Roschelle, Esq.

**STARR ASSOCIATES LLP**
Attorneys for Defendant and Third Party Plaintiff
245 Fifth Avenue, Suite 1102
New York, New York 10016
(212) 620-2681

TO:    Susan McWalters, Esq.
       CERTILMAN BALIN ADLER & HYMAN, LLP
       Attorneys for Plaintiff
       90 Merrick Avenue
       East Meadow, New York 11554
       (516) 296-7000

       Dan Goldwasser, Esq.
       VEDDER, PRICE, KAUFMAN & KAMMHOLZ
       Attorneys for Third-Party Defendant Cornick Garber & Sandler, LLP
       805 Third Avenue
       New York, New York 10022
       (212) 407-7700

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE COMMUNITY PRESERVATION CORPORATION,

                       Plaintiff,

         - against -

1974 REALTY ASSOCIATES,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1974 REALTY ASSOCIATES,

                Third-Party Plaintiff,

         - against -

CORNICK GARBER & SANDLER LLP,

                Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Index No. 21023/02

**AFFIDAVIT**

STATE OF NEW YORK    )
                   ) ss:
COUNTY OF NEW YORK  )

**ELIZABETH CRANE,** being duly sworn, deposes and says:

      1.    I am the vice president of Rosedale Management ("Rosedale"), the managing agent for a building located at 245 East 19th Street, New York, New York ("Building"). Rosedale has managed the Building since 1963. I make this affidavit based on facts known to me to be true and on the books and records maintained by Rosedale.

      2.    I have had the opportunity to review an affidavit of service signed by Robert Winckelmann, sworn to on October 28, 2004, which bears the same caption as this affidavit, in which Mr. Winckelmann states that on October 27, 2004, he served a summons

and complaint for foreclosure of a mortgage on Jonathan Poole, as President of PR & PR Realty, by delivering to the Building a copy thereof to Jose Molina/Concierge.

3.    One of my duties as vice president of Rosedale is to issue and sign payroll checks. Not being familiar with the name Jose Molina as ever having worked for Rosedale or the Building, I reviewed the payroll register for the months of October and November, 2004. Having done so, I was able to confirm that no such person was employed by Rosedale or the Building on October 27, 2004, as is stated erroneously in the affidavit of service.

WHEREFORE, the motion of 1974 Realty Associates to dismiss the complaint should be granted, with costs and disbursements.

_____
ELIZABETH CRANE

Sworn to before me
this //th day of May, 2005

_____
NOTARY PUBLIC

ZORAIDA MARTINEZ
Notary Public, State of New York
No. 01MA6084976
Qualified in New York County
Commission Expires Dec. 16, 2006

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------------X
THE COMMUNITY PRESERVATION CORPORATION,

                          Plaintiff,          Index No. 21023/02

               - against -

1974 REALTY ASSOCIATES,

                          Defendant.
------------------------------------------------------------------------X
STATE OF NEW YORK    )
                       ) ss:
COUNTY OF QUEENS    )

JEROME S. REZNICK, being duly sworn, deposes and says::

1.      That I am a Limited Partner owing a 26.3625% undivided percentage interest of 1974 Realty Associates (hereinafter referred to as "1974") and an officer, director and a 27% shareholder of PR & PR REALTY CORP., a General Partner of 1974.

2.      This affirmation is submitted in support of the application to permit PR to intervene in this action pursuant to Section 1012 (a) 2, and 3 of the CPLR as a party defendant and/or to enjoin and restrain a Limited Partner of 1974, Jonathan Poole (hereinafter referred to as "Poole") and his counsel, Andrea Rochelle from participating in or having any control of the issues involved in this litigation to foreclose two building loans on the property owned by 1974.

3.      Poole, as a Limited Partner of 1974 owns only 9.875% of an undivided percentage interest and while as an officer of PR owns only 10% of the outstanding of stock. The other interested parties are Midwood Friends Development Corp., a General

Partner owing a 1.00% undivided percentage interest in 1974; the Estate of Seymour Robinson, a Limited Partner owing a 26.3625% undivided percentage interest in 1974 and the Estate of Lawrence Pesce, a Limited Partner owing a 35.1500% undivided percentage interest in 1974.

4.      Sections 1012 (a) 2 and 3 of the CPLR were designed to protect an interest party from the effects of litigation a) where their representation is adequate and that where they will be bound by a judgment and b) where the interested party may be adversely affected by the judgment. That is the present factual situation in this action.

5.      This foreclosure action was commenced on May 28, 2002 by The Community Preservation Corporation (hereinafter referred to as "CPC") to foreclose two building loans that were placed on the subject property on November 24, 1987.

6.      Article XII of the Limited Partnership Agreement of 1974 Realty Associates, a copy of which is annexed hereto, made part hereof and marked Exhibit "A" requires, as a condition precedent, that any dispute between the signatories be submitted to non-binding arbitration.

7.      On or about May 16, 2002, such a Demand was served on Poole on behalf of 1974 and ~~Jerome S. Reznick~~, a copy of which is annexed hereto, made part hereof and marked Exhibit "B". In an attempt to stop this procedure, Poole, by attorney Claude Castro, moved this Court for an order to stay the arbitration. Although this application was subsequently denied, Poole:

- FAILED TO DISCLOSE TO THE COURT THAT THIS PROCEEDING TO FORECLOSE THE BUILDING LOANS WAS THEN PENDING IN THE SAME COURT;

-2-

2002/21023 Order movant's motion to intervene is denied etc metro_affiana.ffs.me (Page 1 of 16)

- FAILED TO DISCLOSE TO THE OTHER MEMBERS OF THE LIMITED PARTNERSHIP THAT HE HAD BEEN SERVED WITH A SUMMONS AND COMPLAINT IN THIS PROCEEDING;

- FAILED TO DISCLOSE TO ATTORNEY CLAUDE CASTRO, THE ATTORNEY WHO FILED THE PETITION TO STAY THE ARBITRATION,   THAT THIS PROCEEDING TO FORECLOSE THE MORTGAGE WAS PENDING;

- FAILED TO DISCLOSE TO HIS ATTORNEY IN THE SUBJECT PROCEEDING, ANDREA ROSCHELLE, THAT 1974 WAS SEEKING TO PROCEED AGAINST HIM AND HAD COMMENCED THE ARBITRATION PROCEEDINGS;

- FAILED TO DISCLOSE TO THE ATTORNEYS FOR CPC THAT THERE WERE OTHER PARTIES ASSOCIATED WITH 1974;

- FAILED TO PROVIDE CPC WITH THE DOCUMENTATION REQUIRED TO CLOSE A PERMANENT LOAN; and

- FAILED TO COOPERATE WITH THE ATTORNEYS FOR CPC TO RESOLVE AND SETTLE THIS PROCEEDING.

- FAILED TO HAVE ACCOUNTANTS PREPARE THE APPROPRIATE TAX RETURNS FOR 1975 SINCE 1999.

8.    Since November 24, 1987 until July, 2003, Poole and/or his management company, Rosedale Management Corp. (hereinafter referred to as "Rosedale") were, pursuant to the Limited Partnership Agreement of 1974 Realty Associates, designated the managing agent of the subject property.

9.    Chief among their responsibilities was to rent a sufficient amount of the renovated apartments in order to comply with the provisions of a mortgage commitment to convert the building to permanent financing. They failed to accomplish this task during the intervening 13 years.

10.    In addition to failing to rent vacant apartments, as will be noted from the correspondence forming collectively Exhibit "C" annexed hereto, Poole, as the

-3-

representative of 1974, failed to provide CPC with the information required to close the permanent financing. All of the information required by CPC was under the care, custody and control of Poole.

11.    During the course of pending litigation against Poole in Supreme Court, New York County, by a different named plaintiff, we came into possession of a management report of Rosedale dated 4/29/02 concerning 1974,, a copy of the first page is annexed hereto, made part hereof and marked Exhibit "C". The report shows a credit balance of $295,156.57.

12.    When Poole was removed as managing agent, he turned over to the new managing agent the paltry sum of $25,000. Efforts to obtain management reports since April, 2002, have been stonewalled and ignored by Poole.

13.    What happened to approximately $270,000? Since April, 2002 Poole has been collecting monthly rentals of approximately $25,000 and, upon information and belief, has not made any of the required mortgage payments.

14.    Annexed hereto as Exhibit "E" is the proposed answer that PR will submit if it is permitted to intervene.

15.    Poole has been in exclusive control of the litigation since it commenced and as indicated above by his actions he is totally irresponsible and incompetent to protect the interests of 1974 and PR. Poole's obvious motive for embarking on this course of conduct is to delay the day when he will have to explain what happened to over $270,000.

16.    Unless PR is permitted to intervene in this action and Poole is enjoined and restrained from directing the affairs of 1974, both 1974 and PR will suffered irreparable

-4-

2002/21023 Order movant's motion to intervene is denied or motor affirms me (Page 15 of 16)
Case 1:10-cv-04381-PKC Document 6-3   Filed 05/14/2010   Page 9 of 62
561 965-9102
P.17

harm and injury.

17.    Granting the relief sought herein will not prejudice any of the parties nor will it delay any of the proceedings herein.  I have been advised that the attorneys for CPC have been informed that this application was being prepared and they indicated that CPC would welcome PR's intervention.

WHEREFORE, it is respectfully requested that the relief sought by this motion be granted together with such further action as to this Court may seem just and proper.

Jerome S. Reznick

Sworn to before me this
27th Day of October, 2003

**MARYANN PERRONE**
**Notary Public, State of New York**
**No. 01PE4841016**
**Qualified in Westchester County**
**Commission Expires Jan. 31, 2006**

STATE OF NEW YORK, COUNTY OF KINGS      Index No.      Year 19

THE COMMUNITY PRESERVATION CORPORATION,

Plaintiff,

- against -

1974 REALTY ASSOCIATES,

Defendant.

---

NOTICE OF MOTION and AFFIDAVIT

---

EDWIN M. LEVY and A. JOSEPH TANDET

*Attorney(s) for*    PR & PR Realty Corp

*Office and Post Office Address, Telephone*

488 Madison Avenue
Ch.......................7

---

To

*Service of a copy of the within is hereby admitted.*

Dated: ................................19.....

Attorney(s) for

---

**PLEASE TAKE NOTICE:**

☐ **NOTICE OF ENTRY**

that the within is a *(certified) true copy of a*
duly entered in the office of the clerk of the within named court on      19

☐ **NOTICE OF SETTLEMENT**

that an order
will be presented for settlement to the HON.
within named Court, at
on    19    at      M.
Dated,

of which the within is a true copy
one of the judges of the

Yours, etc.

EDWIN M. LEVY

07-07-05    10:10am    From-CBAH 8th FL COPY RM

T-048  P.002/004  F-597

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
THE COMMUNITY PRESERVATION CORPORATION,
                              Plaintiff,          Index No. 21023/02
        - against -
1974 REALTY ASSOCIATES;                           S T I P U L A T I O N
                                                  WITHDRAWING MOTION
                                                  & CROSS MOTION WITHOUT
                                                  PREJUDICE

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
1974 REALTY ASSOCIATES,
                              Plaintiff,
        - against -
CORNICK, GARBLER & SANDLER,
                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WHEREAS, Plaintiff THE COMMUNITY PRESERVATION CORPORATION
(hereinafter "CPC") has brought a certain Motion for a Judgment of
Foreclosure & Sale and

WHEREAS, 1974 REALTY ASSOCIATES (hereinafter "1974") by its
prior counsel crossmoved to dismiss the complaint and

WHEREAS, by Order (a copy of which is annexed hereto and made
a part hereof) of the Honorable Francois Rivera dated June 3, 2005,
Einig & Bush, LLP was substituted as counsel for 1974 and prior
counsel was Ordered to turn over all papers to Einig & Bush, LLP
and

WHEREAS, Prior counsel sought, via Order to Show Cause before
the Appellate Division, to stay the Justice Rivera's Order pending
hearing and determination of its appeal from the Court's Order and

WHEREAS, the Appellate Division denied prior counsel's
application for a stay by Order (a copy of which is annexed hereto
and made a part hereof) dated June 22, 2005 and

WHEREAS, Prior Counsel has and still refuses to turn over the

1

07-07-05   10:10am   From-CBAH 8th FL COPY RM

T-048  P.003/004  F-597

file to present counsel and

WHEREAS, CPC, 1974 and CORNICK, GARBLER & SANDLER (third party defendant hereinafter "CORNICK") desire to explore possible settlement and resolution of all matters between the parties and

THEREFORE, CPC, 1974 and CORNICK herewith stipulate, covenant, and agree as follows:

1.    The motion of CPC and the crossmotion of 1974 are withdrawn without prejudice.

2.    The withdrawal of the motion and crossmotion shall not be deemed an admission, waiver, estoppel or relinquishment of any and all parties' rights, remedies as to the other parties without a stipulation submitted so admitting, waiving or relinquishing.

3.    Nothing in this stipulation shall stay any party from renewing its prior motion or crossmotion from seeking the same relief if in any party's sole and arbitrary discretion it deems it cannot or will not reach a resolution with the other party.

4.    Nothing in this stipulation may preclude 1974 and its counsel in seeking an Order compelling prior counsel to comply with the Order of the Court, hold prior counsel in Contempt or seek sanctions against prior counsel.

5.    The terms, covenants, and conditions herein set forth shall be deemed to bind and obligate, and/or inure to the benefit of, the parties hereto and their respective successors and assigns.

6.    The terms of this Stipulation and Agreement contain the entire agreement between the parties and may not be changed, altered, modified, or abridged in any manner or form except in writing subscribed by all parties hereto.

7.    No failure or delay on the part of any party to exercise any right, power, or remedy herein shall operate as a waiver thereof, nor shall any single or partial exercise of any such

right, power or remedy preclude any other or further exercise
thereof or the exercise of any right, power, or remedy hereunder.

    8.   This stipulation may be executed in facsimile and in
counterpart.

Stipulated and Agreed.
July 5, 2005

CERTILMAN BALIN ADLER & NYMAN
Attorneys for Plaintiff
90 Merrick Avenue
East Meadow, New York 11554
By: Susan McWalters
(516) 296-7100

EINIG & BUSH, LLP
Attorneys for Defendant 1974 Realty Associates
420 Lexington Avenue, Suite 1727
New York, New York 10170
By: Michael R. Bush
(212) 983-5988(x14)

VEDDER PRICE KAUFMAN & KAMMHOLZ, P.C.
Attorneys for Cornick Garber & Sandler
805 Third Avenue
New York, New York 10022
By: Daniel Hollman
(212)407-7700

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------X          Index No.: 21023/02
THE COMMUNITY PRESERVATION CORPORATION,

                    Plaintiff,

          -against-
                                                    **AFFIRMATION IN
                                                    OPPOSITION TO
1974 REALTY ASSOCIATES,                             DEFENDANT'S
                                                    CROSS-MOTION AND
                    Defendant.                      IN FURTHER SUPPORT
                                                    OF MOTION FOR
------------------------------------------X         JUDGMENT OF
                                                    FORECLOSURE AND SALE**

1974 REALTY ASSOCIATES,

                    Third-Party Plaintiff,

          -against-

CORNICK GARBER & SANDLER, LLP,

                    Third-Party Defendant.

------------------------------------------X


          **SUSAN L. McWALTERS**, an attorney duly admitted to

practice law before the courts of the state of New York affirms

the truth of the following under the penalties of perjury:

          1.    I am an attorney at law and a Partner with the firm of

CERTILMAN BALIN ADLER & HYMAN, LLP, attorneys of record for

Plaintiff.  As such I am fully familiar with the facts of this

case and events to date.  I submit this affirmation in opposition

to Defendant's Cross-Motion to dismiss the complaint as abandoned

or in the alternative for lack of jurisdiction over 1974 Realty

Associates (hereinafter "ASSOCIATES") and in further support of plaintiffs motion for a judgment of foreclosure and sale.

2.    Despite Defendants' contention, Plaintiff did move for a Judgment of Foreclosure and Sale within one (1) year. The Summons and Complaint in this action was filed on May 28, 2002, Plaintiff submitted an application for a Judgment of Foreclosure and Sale on December 13, 2002 which was subsequently withdrawn due to the simultaneously filed Order to Show Cause of Defendant seeking to vacate its default in answering based upon a lack of jurisdiction claim.  Defendant set forth that there are triable issues of fact, however, Defendant failed to answer in this action, without an Answer, there are no issues of fact to go to trial on.

3.    Over the past three years, Defendant has been asserting that it desires to obtain financing to satisfy the loans which are the subject of this action.  However, for three (3) years it has failed to do so due to the internal fighting of ASSOCIATES and difficulties at the property.  Plaintiff's attempt to resolve this matter with Defendant should not be construed as abandonment of the action.  Despite the efforts to settle this matter, no settlement is possible when there is internal fighting among ASSOCIATES partners.

4.    The Defendant is correct that the default here is not in payment, the default is in failing to convert the loan to

2

iManage:1691831.1

permanent financing on or before April 1, 1999, **more than six (6) years ago.**  The original due date to convert the loan was May 29, 1989, **sixteen (16) years ago,** which was extended by agreement.

5.   Defendant is trying to turn Plaintiff's attempt to settle against them.  Plaintiff, THE COMMUNITY PRESERVATION CORPORATION is not seeking more than what is due pursuant to the loan agreements, a payoff or conversion of the building loan to permanent financing.

6.   The Plaintiff, THE COMMUNITY PRESERVATION CORPORATION is a not-for-profit affordable housing lender, specializing in financing low and moderate income housing to improve communities. Defendant borrowed the money and has not fulfilled its obligations.  Although Defendant is correct that it has made its "payments" monthly, without prejudice to this litigation, those payments are interest only payments.  Defendant borrowed more than Two Million Dollars at *well below the market rate of interest* in conjunction with special programs aimed at the development of low and moderate income housing.  It is important to note that this is a non amortizing construction loan where Defendants have paid interest only since 1987.  There is no incentive for Defendants to settle this matter where they have not paid any principal since the inception of the loan some eighteen (18) years ago.  The basis for the loan was for defendants to set up low income housing and accordingly there are

iManage:1691831.1

certain requirements in the Building Loan Agreement to have a certain percentage of housing go to low income which is the purpose of the loan.

7. Defendant's allegations that Plaintiff somehow caused the default in failing to convert the loan to permanent financing is absurd. The subject loans matured. Defendant must payoff or convert the loans to permanent financing which it can do with another lender. Plaintiff, in no way, encouraged Resnick to "undermine the authority of Poole". The fact of the matter is that Resnick was trying to settle this matter and has an interest in ASSOCIATES. Annexed hereto as Exhibit "A" is the Building Loan Agreement which sets forth the requirements with respect to renting the premises. The rental requirements are not being imposed to prevent a settlement in this matter, but are specifically required in the Building Loan Agreement and Mortgage which Defendant agreed to comply with. The Court's attention is respectfully invited to Paragraph 25 (iii) whereby the borrower 'must deliver satisfactory evidence to the lender certifying that the legally collectable rents at the premises are at least the rental minimum defined in Exhibit "B", without concession or rebate of any kind'. Exhibit "B" of the Building Loan Agreement at Paragraph 10 sets the rental minimum at $248,256.00 from the apartments.

iManage:1691831.1

8.   These requirements are further set forth in the building mortgages annexed hereto as Exhibits "B" and "C" at Paragraph 32, where it specifically states that the Building Loan Agreement including, without limitation, the provisions thereof entitling the mortgagee to declare the entire indebtedness secured hereby to be immediately due and payable, all of which provisions are incorporated herein with the same force and with like effect as if they were fully set for the herein at length and made part hereof.  In addition, Paragraph 62 of the Rider to the First Mortgage (and Paragraph 64 of the Second Mortgage) sets forth that at least nineteen (19) units in the premises must be rented to lower income tenants from the period running from initial occupancy to twenty (20) years after 50% of the units are occupied.  Accordingly, it is clear that the purpose of the mortgage was to create lower income housing with certain rent restrictions.  For Defendant to state that the Plaintiffs were somehow hindering the settlement based upon the obligations specifically in the Building Loan Agreement and Mortgages is entirely baseless.

9.   Defendant goes on at length with respect to the problems they have had with the property, but the matter is quite simple, they were to have paid the loan off or converted to permanent financing by April, 1999 and they have failed to do so. There is no defense to that and all of Defendants' purported

iManage:1691831.1

defenses and infighting within ASSOCIATES and problems with the
premises have nothing to do with their obligation to Plaintiff
and failure to payoff or convert the loan upon maturity.  The
Defendant's problems at the premises in low vacancies was not
caused or contributed to by Plaintiff and the suggestion of such
is clearly baseless.  As stated above, the obligations are
clearly set forth in the loan agreements which Defendant signed
and is not something new that Plaintiff invented to hinder
conversion to permanent financing. Plaintiff would like nothing
more that to settle, but is not required to change the terms of
the loan agreements which set forth the parties intentions from
the inception of the loans.  The past several years and claims of
wanting to settle have amounted to nothing but a delay tactic and
now several years later when Plaintiff had no alternative but to
proceed with this action.

10.  Defendant seeks to blame Resnick for wrongful acts for
failing to provide the necessary documentation to settle this
matter, however, Resnick is part of 1974 which is just additional
evidence that Poole as purported President of PR & PR Realty
Corp., the managing general partner of Defendant 1974 Realty
Corp., is attempting to use the company's infighting to delay
this foreclosure action.

iManage:1691831.1

11.  Defendant refers to its December 2002 Order to Show Cause which ultimately was marked off.  Plaintiff is not conceeding that Plaintiff's initial service of process was not proper, but merely re-served Defendant to avoid any issue with respect to service.  Accordingly, Defendant was served by service upon Jonathan Poole and it again failed to answer.  Defendant's assertion regarding service being improper pursuant to CPLR 311 is incorrect as 1974 Realty Associates is not a corporation, but a limited partnership.  Therefore, CPLR 310 relating to limited partnerships controls.  Pursuant to CPLR 310 and 308(2), service on a limited partnership may be made by delivery to a person of suitable age and discretion at the home of the general partner. _Maine v. Jay Street Realty Associates,_ 722 N.Y.S.2d 726, 187 Misc.2d 376(Sup.Ct. NY Co. 2001).  Where service cannot be made at an apartment due to blocked access, service is proper upon the concierge on the building which is what was done in this case.

12.  Section 306-b of the CPLR specifically permits the court to ratify late service upon a party.  Clearly there is no prejudice where defendant back in 2002 moved to vacate its default in answering, and in 2003 attempted to serve a late answer.  Clearly, it had knowledge of this action and is in no way prejudiced by Plaintiff serving process twice, nor late.  In fact, serving a second time gave Defendant a second opportunity to answer which it failed to do.  Given the history of this case,

iManage:1691831.1

permitting late service is in the interest of judicial economy. Not validating service *nunc pro tunc,* would only mean commencement of a second action and further burden the court. Therefore, Defendant was not prejudiced and the late service should be validated nunc pro tunc.

13.    With respect to the claimed deficiencies in the Motion for Judgment of Foreclosure and Sale.  The affirmation makes specific reference to prior affirmation and affidavit of merit submitted to this court which included copies of all pertinent loan documents and an Affidavit of Merit.  Furthermore, it references and seeks to confirm the Referee's Oath and Report which contains all loan documents and an affidavit of plaintiff setting forth the amount due.  Accordingly, Defendant's argument is entirely baseless and is merely another attempt to thwart ASSOCIATES' responsibilities and obligations under the loans. Your affirmant's office has made thousands of applications for judgments of foreclosure and sale in this form and substance which have been granted.  There is no prohibition that standard foreclosure language cannot be used in a motion for a judgment of foreclosure and sale, in fact it must be used.

14.    This case is simple.  The Defendant was served, it failed to answer, and plaintiff is moving for a judgment which should be granted by this Court.  The Affidavit of Defendant is nothing more than a distraction simply because ASSOCIATES has no

8

defense to this action other than to attempt to find the Motion for a Judgment of Foreclosure and Sale itself is insufficient. It is urged that the Court reject these purported defenses.

15. Significantly, Defendant has no excuse for failing to move to vacate its default in answering the complaint and accordingly, its requests to dismiss the complaint for lack of jurisdiction should be denied. In 2002, Defendant moved to vacate its default in answering yet, abandoned that motion whether, as Defendant claimed, voluntarily, or not. Nevertheless, the motion was abandoned. Even upon receiving the Notice of Return of the Late Answer in December of 2003 Defendant did nothing to vacate its default in answering. Instead awaited Plaintiff's re-service and motion for a judgment of foreclosure and sale before making any application to the Court. Moreover, Defendant has not set forth a reasonable excuse for failing to pursue a vacature of its default in answering. Accordingly, Defendant should be barred from moving to vacate its default.

WHEREFORE, it is respectfully requested that Defendant's cross-motion be denied in its entirety and Plaintiff be granted a Judgment of Foreclosure and Sale together with such other and further relief as the Court deems just and proper.

Dated: East Meadow, New York
      May 20, 2005

SUSAN L. McWALTERS

9

iManage:1691831.1

**Exhibit A**

THE COMMUNITY PRESERVATION CORPORATION

AND

1974 REALTY ASSOCIATES

BUILDING LOAN AGREEMENT

Dated: November 24, 1987
Premises: 1974 51st Street
          Brooklyn, New York

Block: 5460
Lot: 35

Rogers & Wells
200 Park Avenue
New York, New York

BUILDING LOAN AGREEMENT made the 24th day of November, 1987, between THE COMMUNITY PRESERVATION CORPORATION (formerly THE NEW YORK CITY COMMUNITY PRESERVATION CORPORATION), a private not-for-profit domestic corporation having its principal office at 5 West 37th Street, New York, New York 10018 (the "Lender") and 1974 REALTY ASSOCIATES, a New York limited partnership having an address c/o Eiges & Eiges, 201 Eastern Parkway, Brooklyn, New York 11238 (the "Borrower").

The Borrower is owner of the fee interest in the premises (the "Premises") described in Exhibit A hereto and has applied to the Lender for a loan in the amount of TWO MILLION SEVEN HUNDRED NINE THOUSAND ONE HUNDRED SEVENTEEN AND 00/100 ($2,709,117.00) or so much thereof as may be advanced subject to the terms hereof (the "Loan"), to aid the Borrower in the rehabilitation of the Premises and the construction on the Premises of improvements (the "Improvement") described herein and in Exhibit B hereto:

Accordingly, the Lender and the Borrower agree as follows:

1. **The Loan.** The Lender shall make the Loan, subject to the terms and conditions hereof.

2. **The Note and the Mortgage.** The Loan shall be evidenced by (a) a note ("First Building Loan Note") in the amount of $165,000.00 ("First Building Loan Note Amount"), secured by a first mortgage made and delivered by the Borrower to CPC this date ("First Building Loan Mortgage"); (b) a note ("Second Building Loan Note") in the amount of $1,475,000.00 ("Second Building Loan Note Amount") secured by a mortgage made and delivered by the Borrower to CPC this date ("Second Building Loan Mortgage"); and (c) a note ("Third Building Loan Note") in the amount of $1,069,117.00 ("Third Building Loan Note Amount") secured by a mortgage made and delivered by the Borrower to HPD this date ("Third Building Loan Mortgage"). All the aforementioned notes or bonds are hereinafter collectively referred to as the "Note", all such notes or bonds being in the aggregate unpaid principal amount of $2,709,117.00 ("Aggregate Loan Amount") with principal and interest being payable as provided in the First Building Loan Note, Second Building Loan Note and the Third Building Loan Note. The Note shall be secured by the First Building Loan Mortgage, the Second Building Loan Mortgage and the Third Building Loan

Mortgage (such First Building Loan Mortgage, Second Building Loan Mortgage and Third Building Loan Mortgage being hereinafter collectively referred to as the "Mortgage"). The Mortgage covers the Premises and the Improvement to be erected thereon. Such Premises and the Improvement are sometimes hereinafter collectively referred to as the "Mortgaged Property."

It is understood that $164,789.00 of the Loan is being used this date to acquire the Premises. It is being understood that any additional payments for the acquisition of the Premises are the sole obligation of Borrower.

The Lender may at any time release portions of the Mortgaged Property from the provisions of this Agreement and from the Mortgage executed and delivered pursuant hereto upon such terms and conditions as the Lender shall deem fit. The Lender may at any time extend the payment of the principal secured by the Note and Mortgage, and any extensions so granted shall be deemed made in pursuance of this Agreement and not to be modifications thereof.

3. The Improvement. The Borrower shall expeditiously in a good and workmanlike manner construct and equip the Improvement in accordance with the construction contract (the "Construction Contract") referred to in Exhibit B and the plans and specifications (the "Plans and Specifications") referred to in Exhibit B, free and clear of all liens, encumbrances and security instruments (other than the Mortgage). The Plans and Specifications, and each addition or modification, shall be approved in writing by the Lender, the general contractor designated in Exhibit B (the "General Contractor"), constructing the Improvement and, if required by statute or governmental code or regulation, all governmental authorities having jurisdiction over the Mortgaged Property ("Governmental Authorities"). The Plans and Specifications as approved by the Lender shall become the property of the Lender. The Improvement shall be constructed and equipped in compliance with requirements of Governmental Authorities and the appropriate Board of Fire Underwriters or other similar body acting in and for the locality in which the Premises are situated. No modification of or amendment to the Construction Contract, including any general conditions thereof, with the General Contractor providing for construction of the Improvement shall be made without the Lender's written approval and the Borrower shall observe and perform all of the terms and provisions of the Construction Contract on the Borrower's part to be observed or performed. Compliance with the provisions of this Section 3 and any other provisions of this Agreement

2

relating to constructing and equipping the Improvement shall be determined by the Supervising Engineer defined in Exhibit B. At all times the Lender and the Supervising Engineer, their agents and employees, shall have the right of entry and free access to the Premises to inspect the Mortgaged Property. When set forth in the Construction Contract, the Borrower shall furnish to the Supervising Engineer, all "catalogue cuts", shop and other related drawings used in connection with the Plans and Specifications and shall have received the Supervising Engineer's approval of such, prior to purchase and installation of the affected item.

4.  Advances.  The Loan shall be advanced in accordance with the provisions set forth in Schedule I. All sums advanced pursuant to any provision of this Agreement, except the proceeds of any insurance referred to in Section 7(ç), shall be deemed advances under this Agreement, evidenced by the Note and secured by the Mortgage. If the Lender makes advances before they are due in accordance with the provisions of Schedule I because the Lender believes it advisable to do so, such advances shall be deemed to be made in pursuance and not in modification hereof, but the making of any such advance or part thereof shall not be deemed an approval or acceptance by the Lender of the work done on the Improvement prior thereto.

5.  Title Insurance.  The Borrower shall deliver to the Lender a standard mortgagee's policy of title insurance together with a certificate of title of a title insurance company (the "Title Company") satisfactory to the Lender and its counsel containing the Title Company's agreement to issue its policy of title insurance in the amount of the Loan and in form and substance satisfactory to and approved by the Lender. A copy of a survey and additional surveys as requested or required by the Lender and/or the Title Company, shall be delivered to the Lender and the state of facts shown therein shall be satisfactory to and approved by the Lender.

6.  Hazard Insurance.  The Borrower shall furnish to the Lender (with evidence of the payment of premiums therefore), or the Lender may obtain at the Borrower's expense, insurance as required by the Mortgage. Such insurance shall be subject to the Lender's approval, as to companies, form, contents, coverage and expiration dates, and shall be, if the Lender so requests, on "Builder's Risk Completed Value" policy form. The originals of such policies shall be delivered to the Lender and shall contain the New York Standard Mortgagee Clause naming the Lender as Mortgagee and bear endorsement of payment of premiums thereon. The Borrower shall also furnish to the

3

Lender, as may be required by the Lender, duplicate originals of policies in adequate amounts evidencing coverage of the Borrower and the Mortgaged Property against public liability, property damage and workmen's compensation claims.

7. Specific Additional Covenants of the Borrower. The Borrower shall:

(a) Furnish to the Lender within 30 days after the completion of the Improvement the original permanent certificate of occupancy, if applicable, and all other necessary certificates, licenses, consents and other approvals of Governmental Authorities and the appropriate Board of Fire Underwriters or other similar body acting in and for the locality in which the Premises are situated. In no event shall the Lender be required to make the last advance of the Loan pursuant to the provisions hereof until all such certificates, licenses, consents and approvals have been obtained and delivered to the Lender.

(b) Furnish to the Lender from time to time upon request (i) financial statements of the Borrower, (ii) information as to the Borrower's financial condition, (iii) the names of all persons with whom the Borrower has contracted or intends to contract for the construction of the Improvement or the furnishing of labor or materials therefor, (iv) list of all unpaid bills for labor and materials with respect to construction of the Improvement, (v) budgets of the Borrower and revisions thereof showing estimated cost of construction of the Improvement and funds required at any given time to complete and pay for such construction and shall permit the Lender's representatives to have access to the Premises at all reasonable times and to examine all agreements, plans and specifications pertaining thereto or the Improvement or any part thereof, and (vi) lien waivers, receipted bills or other evidences of payment with respect to the cost of the Improvement and any other costs and expenses relating to the Mortgaged Property.

(c) Proceed immediately, if the Improvement is partially or totally damaged or destroyed by fire or other casualty, with the restoration thereof and diligently prosecute the work of restoration to completion, provided, however, that the Lender shall

4

elect to make available to the Borrower the proceeds of any fire or other casualty insurance paid to and received by the Lender with respect to such damage or destruction, such proceeds to be payable in advances based on certifications of the Supervising Engineer, but the cost of such restoration, or any part thereof, shall not be made the basis of any application for advances under this Agreement.

(d) Pay when due all obligations incurred by the Borrower for the cost of constructing the Improvement or for any restoration pursuant to Section 7(c).

(e) Comply with the terms, provisions and conditions of the commitment of the Long Term Lender designated in Exhibit B and keep such commitment in full force and effect.

8. The Borrower to Pay Fees and Charges. The Borrower shall pay all fees and charges incurred in the procuring and making of the Loan, including, without limitation, fees and expenses relating to examination of title, title insurance premiums, surveys, and mortgage recording, documentary, transfer or other similar taxes, fees and revenue stamps.

The Lender may deduct from any payment to be made under this Agreement any amount necessary for the payment of any fees and expenses relating to the examination of the title to said Premises, including cost of surveys, charges for appraisals, inspections, drawing of papers, mortgage recording tax, revenue stamps, if any, and architects', engineers' and building loan service fees, and any expenses incurred in the procuring or the making of the said loan, and in the payment of any insurance premiums, mortgages, tax, assessment, water rate, sewer rents and other charges, liens and encumbrances upon the said Premises whether before or after the making of said loan and any other amounts necessary for the payment of the cost of improvement as defined by the Lien Law, and apply such amounts in making said payments, and all sums so applied shall be deemed advances under this Agreement and secured by said Note and Mortgage.

9. Permitted Assignment by the Lender. The Lender may assign this Agreement, the Note and the Mortgage to any other person, firm or corporation provided that all of the provisions hereof shall continue in force and effect and, in the event of such assignment, any advances made by any assignee

5

shall be deemed made in pursuance and not in modification hereof and shall be evidenced and secured by the Note and the Mortgage.

10. No Assignment by the Borrower. The Borrower shall not assign this Agreement or the moneys to be advanced hereunder or convey, assign, pledge, encumber or mortgage (except for the Mortgage) any part of the Mortgaged Property without the prior written consent of the Lender, but if the Borrower does any of the foregoing the Lender may at the Lender's option continue to make advances hereunder to the Borrower or to those who succeed to the interest of the Borrower in the Mortgaged Property and all sums so advanced by the Lender shall be deemed advances made in pursuance and not in modification hereof and shall be evidenced and secured by the Note and the Mortgage.

11. Events of Default. If one or more of the following events (an "Event of Default") shall occur and be continuing:

(a) The Borrower defaults in the performance of any covenant hereunder to be performed by the Borrower or fails to keep or observe any condition, stipulation or agreement made hereunder;

(b) A default shall occur under the Note or the Mortgage after expiration of a grace period, if any;

(c) If any survey required by the Lender during the period of construction shows any matters not approved by the Lender (as shown on the survey provided for in Section 5 of this Agreement), and such matter not approved is not removed within thirty days after notice thereof by the Lender to the Borrower;

(d) The Improvement is not completed in accordance with the Plans and Specifications in the judgment of the Supervising Engineer on or before the Completion Date (as defined in Exhibit B);

(e) The construction of the Improvement in the judgment of the Supervising Engineer is not carried on with reasonable diligence or the Supervising Engineer is of the opinion that the Improvement cannot be completed by the Completion Date;

6

(f) If (i) the Borrower executes any chattel mortgage or other security agreement with respect to any materials, fixtures or articles used in the construction of the Improvement or the operation of the Mortgaged Property or with respect to any articles of personal property constituting part of the Mortgaged Property, or (ii) any such material, fixtures or articles are not in accordance with the Plans and Specifications or are purchased pursuant to any conditional sales contract or other security agreement or otherwise so that the ownership thereof will not vest unconditionally in the Borrower free from encumbrances upon being made a part of the Mortgaged Property, or (iii) the Borrower does not furnish to the Lender on request the contracts, bill of sale, statements, receipted vouchers and agreements, or any of them, under which the Borrower claims title to such materials, fixtures or articles;

(g) A petition in bankruptcy is filed by or against the Borrower, or if the Borrower files a petition for reorganization under any of the provisions of the Bankruptcy Act or of any other law, state or federal, or if a receiver or trustee of any property of the Borrower is appointed and, if appointed without the Borrower's consent, is not discharged within 60 days, or if the Borrower makes an assignment for the benefit of creditors, or if the Borrower be adjudged insolvent by any State or Federal court of competent jurisdiction, or if an attachment or execution is levied against any substantial portion of the property of the Borrower and is not discharged within 30 days;

(h) The Borrower assigns this Agreement or any of said advances or any interest therein, or if said Premises are conveyed or encumbered in any way without the written consent of the Lender, or if the Borrower dies before receiving the final advance hereunder;

(i) If the Improvement on said Premises is, in the judgment of the Lender, materially injured or destroyed by fire or otherwise;

(j) The Borrower does not permit the Lender, or representatives of the Lender, to enter upon said Premises and inspect the Improvement thereon at all reasonable times and examine all detailed plans, shop

7

drawings and specifications which are kept at the work, or fails to furnish to them, when requested, copies of such plans, drawings and specifications;

(k) If for any cause whatever the construction of said Improvement is at any time discontinued or not carried on with reasonable dispatch in the judgment of the Lender;

(l) If the Borrower fails to comply with any requirement of any Governmental Authority having jurisdiction within thirty days after notice in writing of such requirement shall have been given to said Borrower; or fails to furnish to the Lender, when requested, official searches made by the Governmental Authorities having jurisdiction;

(m) If the Borrower does not disclose to the Lender, upon demand, the names of all persons with whom the Borrower contracted or intends to contract for the construction of said Improvement or the furnishing of labor or materials therefor; and

(n) The Borrower fails to have a Letter of Credit, satisfactory to CPC, maintained and/or extended by an approved bank until such time as the Mortgage is converted to permanent financing;

The Lender:

(1) shall not have any obligation to make any further advance hereunder;

(2) may declare the indebtedness evidenced and secured by the Note and the Mortgage immediately due and payable; and

(3) may pursue any and all remedies provided for hereunder and in the Note and the Mortgage.

12. Other Remedies of the Lender. Upon the occurrence of an Event of Default, whether or not the indebtedness evidenced and secured by the Note and the Mortgage shall be due and payable or the Lender shall have instituted any foreclosure or other action for the enforcement of the Mortgage or the Note, or if the construction of said Improvement be at any time discontinued or not carried on with reasonable dispatch in the judgment of the Lender, the Lender

may, in addition to any other remedies which the Lender may have hereunder and in the Lender's sole and absolute discretion, (a) enter upon the Premises and complete the Improvement in accordance with the Plans and Specifications with such changes therein as the Lender may deem appropriate and employ watchmen to protect the Mortgaged Property, all at the risk, cost and expense of the Borrower, (b) at any time discontinue any work commenced in respect of the Improvement or change any course of action undertaken by it and not be bound by any limitations or requirements of time whether set forth herein or otherwise, (c) assume any construction contract made by the Borrower in any way relating to the Improvement and take over and use all or any part of the labor, materials, supplies and equipment contracted for by the Borrower, whether or not previously incorporated into the Improvement, and (d) in connection with any construction of the Improvement undertaken by the Lender pursuant to the provisions of this Section (i) engage builders, contractors, architects, engineers and others for the purpose of furnishing labor, materials and equipment in connection with any construction of the Improvement, (ii) pay, settle or compromise all bills or claims which may become liens against the Premises and/or the Improvement, or which have been or may be incurred in any manner in connection with completing the Improvement or for the discharge of liens, encumbrances or defects in the title of the Premises and/or the Improvement, (iii) prosecute and defend all actions or proceedings in connection with the making of the Improvement, (iv) take or refrain from taking such action hereunder as the Lender may from time to time determine and (v) to do any and every act which the Borrower might do in its own behalf to complete said Improvement. The Borrower shall be liable to the Lender for all sums paid or incurred to construct and equip the Improvement whether the same shall be paid or incurred pursuant to the provisions of this Section or otherwise, and all payments made or liabilities incurred by the Lender hereunder of any kind whatsoever shall be paid by the Borrower to the Lender upon demand with interest at the rate provided in the Note or Mortgage from the date of payment by the Lender to the date of payment to the Lender. For the purpose of exercising the rights granted by this Section 12 the Borrower hereby assigns and quitclaims to the Lender all sums unadvanced under this Agreement and hereby irrevocably constitutes and appoints the Lender its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and to do and perform any acts in the name and on behalf of the Borrower. It is understood and agreed that this power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

9

All sums paid or expended in accordance with any of the foregoing provisions shall be deemed advances to the Borrower and secured by the Note and Mortgage and may be applied, at the option of the Lender, to any advances thereafter becoming due. The Lender shall have the right to use any funds of the Borrower in addition to any funds that remain unadvanced under this Agreement for the purposes provided in this Section 12.

13. Provisions of the Note and the Mortgage. The Note and the Mortgage are subject to the conditions, stipulations, agreements and covenants contained herein to the same extent and effect as if fully set forth therein until this Agreement is terminated by (i) the Completion of the Improvement, the making of the final advance hereunder and the assignment to and purchase by the Long Term Lender, if any (or another assignee), of the Note and the Mortgage or (ii) the payment to the Lender of all principal, interest and other sums due and owing on the Note and the Mortgage.

In the event that there should be any default by the Borrower in the performance of any of the conditions, stipulations, agreements and covenants contained in this Agreement or in any note, a mortgage and/or consolidation and extension agreement given in connection therewith, then at the option of the Lender, the principal indebtedness secured by all or any of such notes, mortgages and/or consolidation and extension agreements shall immediately become due and payable and all of any such mortgages may be foreclosed in either one or more actions, and any judgment of foreclosure and sale obtained therein may direct that the Mortgaged Property covered by all the mortgages sought to be foreclosed in such action be sold in one parcel.

14. Further Assurances. The Borrower shall on demand of the Lender do any act or execute any additional documents required by the Lender to secure the Note or confirm the lien of the Mortgage or to comply with any commitment, held by the Borrower providing for the making of a long-term loan secured by a mortgage covering the Mortgaged Property, including but not limited to a note, mortgage and other security instruments, or an agreement extending or otherwise modifying the Mortgage, the Note, and any other documents executed and delivered in connection with the Loan, or a certificate as to the amount of indebtedness evidenced by the Note.

10

14a.  Intentionally omitted

15.  Representations   and   Warranties.   The   Borrower
represents and warrants to the Lender that:

(a) The  Plans  and  Specifications  have  been
submitted  to  and  approved  by  the General Contractor
and have to the extent required by law been submitted
to  and  approved  by  all  Governmental  Authorities and
all  necessary  building  permits  and  approvals
(including  but  not  limited  to,  all  environmental
approvals) for the Improvement have been  obtained  from
the appropriate Governmental Authorities.

(b)  The  Mortgaged  Property is not now damaged or
injured as a result of any  fire,  explosion,  accident,
flood or other casualty.

(c)  No  condemnation  or eminent domain proceeding
has been commenced or to the knowledge of  the  Borrower
is about to be commenced against the Premises.

(d)  The  Borrower  has  no  knowledge of any notes
or notices of violation  of  Federal  law  or  municipal
ordinances  or  orders  or  requirements of the state in
which  the  Premises  are  located  or  any  municipal
department or other Governmental Authority, except  for
violations  of  record,  which  violations  shall  be
removed by the Borrower prior to the Completion Date.

16.  Commencement of Construction.  The  Borrower  shall
commence  construction  of  the  Improvement within 30 days after
the date hereof and shall continue with such  construction  until
the  Improvement  is  completed in accordance with the provisions
hereof.

17.  Construction  of  Agreement.   The   title   and
headings  preceding  the  Articles  of  this  Agreement have been
inserted for convenience of reference only and are  not  intended
to  summarize  or  otherwise  describe the subject matter of such
Articles  and  shall  not  be  given any consideration in  the
construction of this Agreement.

18.  Trust Fund.  The  Borrower,  in  compliance  with
Section 13 of the Lien Law, shall  receive  the  advances  to  be
made  under  this  Agreement  and shall hold the right to receive
such advances as a  trust  fund  to  be  applied  first  for  the
purpose  of  paying the cost of the Improvement, and the Borrower

11

will apply the same first to the payment of the cost of the Improvement before using any part of the total of the same for any other purpose.

19. Parties Bound, etc. The provisions of this Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective heirs, personal representatives, successors and assigns (except as otherwise prohibited by this Agreement).

20. Death. In the event of the death of the Borrower while still holding title to the Mortgaged Property the Lender may, at the option of the Lender, in case the work upon the said Improvement is continued as provided in this Agreement, continue to make advances under this Agreement, and subject to all its terms and conditions, to the Borrower's executors or administrators; and all sums so advanced by the Lender shall be deemed advances under this Agreement, and not to be modifications thereof, as if made to the Borrower in his lifetime, and shall be secured by said Note and Mortgage.

21. Waivers. The Lender may at any time and from time to time waive any one or more of the conditions contained herein, but any such waiver shall be deemed to be made in pursuance hereof and not in modification hereof, and any such waiver in any instance or under any particular circumstance shall not be considered a waiver of such condition in any other instance or any other circumstance. The Agreement may not be changed or terminated orally.

22. Governing Law. This Agreement is and shall be deemed to be a contract entered into pursuant to the laws of the State of New York and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the State of New York.

23. Severability. If any term, covenant or condition of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such term, covenant or condition.

24. Notices. Any notice, request, demand, statement or consent made hereunder shall be in writing and shall be sent by first class mail, and shall be deemed given when postmarked and addressed as follows:

12

If to the Lender:

    The New York City Community
    Preservation Corporation
    5 West 37th Street
    New York, New York  10018

    and

    The City of New York
    Department of Housing Preservation and Development
    100 Gold Street
    New York, New York  10038

If to the Borrower:

    To the name and address first above written.

Each party may designate a change of address by notice to the other party, given at least fifteen (15) days before such change of address is to become effective.

    25.   <u>Completion of Improvement</u>. The Improvement shall not be deemed to have been completed until (i) the Improvement shall contain all equipment which may be required by Governmental Authorities and/or by any law, regulation or rule of any Governmental Authority, (ii) permanent certificates of occupancy, if applicable, and all other necessary certificates, licenses, consents and other approvals of Governmental Authorities acting in and for the locality in which the Premises are situated have been issued or made with respect to the Improvement and (iii) the Borrower delivers satisfactory evidence to the Lender certifying that the legally collectible rents at the Premises are at least the Rental Minimum defined in Exhibit B, without concession or rebate of any kind.

    26.   <u>Section 22 - Lien Law</u>. A true statement under oath, verified by the Borrower as required by Section 22 of the Lien Law, is attached hereto as Exhibit C and made part of this Agreement.

    27.   <u>Schedules and Exhibits</u>. Schedule I and II and Exhibits A, B, B-1, B-2, B-3 and C are attached hereto and by reference made a part hereof and any failure by the Borrower to observe and perform the terms and conditions contained therein shall constitute an Event of Default under Article 11 of this Agreement.

13

28. Staff Person. The Borrower agrees to provide during the period of this construction loan a fulltime staff person whose sole responsibility is to coordinate the construction work at the Premises and to serve as a liaison between the tenants of the Premises and the Construction Contractor.

29. Beginning of Construction. Borrower must begin construction prior to November 29, 1987. For the purposes of this section, construction means the beginning of initial site clearance and preparation, provided that the activities are pursued diligently and are followed without any delay by other construction activities. Notwithstanding anything to the contrary, Lender and Borrower understand that HPD will make the Third Building Loan Amount available for construction only after the United States Department of Housing and Urban Development ("HUD")'s "Early Start" approval and the beginning of construction prior to November 29, 1987 pursuant to such approval, and after HUD's approval of the "Evidentiary Materials" listed in the Grant Agreement executed between the City of New York and HUD pursuant to Section 17 of the U.S. Housing Act of 1937. Insofar as HUD may require changes in certain Building Loan Documents, HPD, Lender and Borrower agree to reasonably cooperate with HUD so that HUD will approve said documents, provided such changes are satisfactory to Lender and HPD.

IN WITNESS WHEREOF, the Lender and the Borrower have duly executed this Agreement the day and year first above written.

WITNESSED:

                    THE COMMUNITY PRESERVATION CORPORATION


_Patricia L. De Natale_          By _Mariann Perseo_
                                    Mariann Perseo
                                    Corporate Secretary



WITNESSED:

                    1974 REALTY ASSOCIATES
                    By:  PR & PR REALTY CORP.,
                         General Partner

                    By _Jonathan Poole_
                       Jonathan Poole, President


                         14

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

On this 24 day of November, 1987, before me personally came Jonathan Poole, to me known, and who, being duly sworn, did depose and say: That he resides at 245 East 19th Street, New York, New York; that he is the President of PR & PR REALTY CORP., a corporation duly organized under the laws of the State of New York, having its principal place of business at 475 Tuckahoe Road, Yonkers, New York; that said corporation is a General Partner of 1974 REALTY ASSOCIATES, a New York Limited Partnership, the firm described in and which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed to said instrument is such a corporate seal; that it was affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order, and he acknowledged to me that the said instrument was executed by said corporation for and in behalf of said partnership.

_____
Notary Public

. h KLAGSBRUN
Nota. ...blic, State of New York
No. 31-4760502
Qualified in New York County
Commission Expires May 31, 1988

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

On the 24th day of November, 1987 before me personally came MARIANN PERSEO, to me known, who, being by me duly sworn, did depose and say that she resides at 131 W. 28th Street, New York, New York, that she is the Corporate Secretary of THE COMMUNITY PRESERVATION CORPORATION, the corporation described in and which executed the foregoing instrument; that she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that she signed her name thereto by like order.

_____
Notary Public

PATRICIA L. DE NATALE
Notary Public, State of New York
No. 4909278
Qualified in Suffolk County
Commission Expires October 19, 19.. 90

15

SCHEDULE I

DISBURSEMENT OF LOAN

1.  <u>Procedures for Payment of Advances</u>. Advances of the Loan for costs incurred in connection with the construction of the Improvement, as summarized in the Schedule attached as Exhibit B-2 (hereinafter called "Construction Costs") which shows the total cost of the approved trade breakdown items, and for costs, other than Construction Costs, if any, incurred in connection with the Loan and/or the construction of the Improvement, as itemized in the Schedule of Other Project Costs attached hereto as Exhibit B-3 (hereinafter called "Other Project Costs") shall be made pursuant to this Agreement, but not more frequently than once every 30 days. In no event shall Construction Costs be deemed to include the cost of materials stored on or off the Premises. Each advance of the Loan shall be made upon written request of the Borrower to the Lender in the form attached hereto as Schedule II, or upon such other forms as the Lender may from time to time provide (any such

16

request for payment being hereinafter called a "Request for Payment"). Each Request for Payment (i) shall be based upon the Construction Costs and the Other Project Costs, and (ii) shall be accompanied by (a) a currently dated Contractor's Cost Breakdown and Request for Partial Payment from the General Contractor in a form satisfactory to the Lender, (b) such waivers of lien and other documents as may reasonably be required by the Lender and/or the Title Company (to induce the Title Company to insure each advance made hereunder against all mechanics' and materialmen's liens for labor furnished and material supplied in connection with the construction of the Improvement), and (c) the requisitions for payment of the General Contractor and, at the request of the Lender, the requisitions for payment from all subcontractors engaged in the construction of the Improvement, all of which requisitions shall have been approved in writing by the Supervising Engineer and by the Borrower. Each advance of the Loan shall be made, in whole or in part, (i) by check payable to the order of the Borrower or, (ii) at the discretion of the Lender, by paying the General Contractor and/or any subcontractors or labor or materialmen performing work on the Improvement or (iii) in such other manner as shall be mutually agreed upon by the Borrower and the Lender.

17

2.    First    Loan    Advance;    the    Borrower's    Equity
Requirement;  Aggregate  Advances.  The first advance of the Loan
shall include an  amount  equal  to  the *Acquisition* Refinancing  Amount,  if
any,  set  forth  in Exhibit B, such sum to be applied toward the *purchase*
satisfaction  of  any  existing  mortgages  of  record  on  the
Premises.

As a condition precedent to any advances  of  the  Loan,
the   Borrower  shall  first  have  paid  the  Borrower's  Equity
Requirement set forth in Exhibit B.

Aggregate  advances  of  the Loan for Construction Costs
and Other Project Costs shall in no event  exceed  the  Aggregate
Loan  Amount  and the Loan shall, subject to all of the terms and
conditions of this Agreement, be advanced as follows:

(a)  Up  to  the  Construction  Sum  set  forth  in
Exhibit  B  for  Construction  Costs  approved  by  the
Lender   and   the   Supervising   Engineer,   which
Construction Costs  shall  be  deemed  to  include  only
those approved trade breakdown items.

(b)  Up to the Sum  for  Other  Project  Costs  set
forth  in  Exhibit  B  for  Other Project Costs actually
incurred by the Borrower and  approved  by  the  Lender,
which  Other  Project  Costs  shall be deemed to include
only  those  items  designated  and  itemized  in  the
Schedule  of  Other  Project  Costs.  If  Other Project

18

Costs include amounts for refinancing to purchase or satisfy mortgages, the advance shall not exceed the balance due on such mortgages.

3.    Allocation of Funds Advanced between First, Second and Third Building Loan Notes. Each advance when made shall be allocated between the First Building Loan Note, the Second Building Loan Note and the Third Building Loan Note as follows: The amount of each advance allocable to the First Building Loan Note shall be the amount of the total advance multiplied by the "First Loan Allocation Fraction" set forth in Exhibit B; the amount of each advance allocable to the Second Building Loan Note shall be the amount of the total advance multiplied by the "Second Loan Allocation Fraction" set forth in Exhibit B; the amount of each advance allocable to the Third Building Loan Note shall be the amount of the total advance multiplied by the "Third Loan Allocation Fraction" set forth in Exhibit B; provided, however, that the ratio of (i) the sum of the advances allocable to the First and Second Building Loan Notes, plus the portion of the Aggregate Equity Investment expended by the Borrower as set forth in Exhibit B, to (ii) the amount allocable to the Third Building Loan Note shall always be in a ratio not less than 1.86 to 1.00.

If, after the final advance of the Loan, the aggregate principal amount advanced under the First, Second and Third Building Loan Notes is less than the Aggregate Loan Amount,

19

then the Third Building Loan Note Amount shall be reduced by an amount equal to the difference between the Aggregate Loan Amount and the aggregate principal amount advanced under the First, Second and Third Building Loan Notes; the First and Second Building Loan Amounts shall remain unchanged.

4. Advances for Construction Costs. Aggregate advances of the Loan for Construction Costs shall in no event exceed the lesser of the Construction Sum or the Construction Costs actually incurred for work in place as part of the Improvement as certified by the Supervising Engineer, from time to time, pursuant to subparagraph (a) of paragraph 6 of this Schedule I, minus a sum equal to the aggregate of (i) the Borrower's Equity Requirement and (ii) the greater of (x) 10% of the amount obtained by subtracting the Borrower's Equity Requirement from that portion of the Construction Sum set forth in Exhibit B to be advanced for work and materials in place as part of the Improvement as so certified, from time to time, by the Supervising Engineer, or (y) the amount actually held back by the Borrower from the General Contractor and all subcontractors (such greater amount being hereinafter referred to as the "Retainage"). The Retainage shall not be released until construction of the Improvement has been completed in accordance with the Plans and Specifications and all necessary certificates, permits, licenses, consents and approvals have

been issued or obtained with respect thereto, all as set forth in Section 25 of this Agreement and in the provisions of this Schedule I, except that Lender may, from time to time and in its sole discretion, reduce Retainage as it deems appropriate.

5. <u>Advances for Other Project Costs</u>. If any part of any advance of the Loan is to be used to pay Other Project Costs, the Request for Payment in respect thereof shall also be accompanied by (i) an affidavit or certificate of the Borrower setting forth the amount of such Other Project Costs actually incurred to the date thereof and substantiating to the reasonable satisfaction of the Lender that such Other Project Costs included in the Request for Payment are included in the Schedule of Other Project Costs and (ii) other evidence reasonably satisfactory to the Lender that such Other Project Costs included in the Request for Payment have actually been incurred and paid for by the Borrower. If Other Project Costs include amounts for refinancing to purchase or satisfy Mortgage(s), the Request for Payment shall include a statement of the holder of such mortgage(s) certifying as to the existing balance of such mortgage(s).

6. <u>Conditions Precedent to Loan Advances</u>. The Obligation of the Lender to make advances of the Loan pursuant to this Agreement is subject to the following additional conditions precedent:

(a) Each Request for Payment shall be accompanied by a certificate of the Supervising Engineer based upon an "on site" inspection of the Improvement made by the Supervising Engineer not more than ten days prior to the date on which such advance is to be made, in which certificate the Supervising Engineer shall (i) certify that the portion of the Improvement completed as of the date of such inspection has been completed in accordance with the Plans and Specifications and approved by the Supervising Engineer and (ii) state its estimate of (aa) the percentage of construction of the Improvement completed as of the date of such inspection on the basis of work in place as part of the Improvement and the approved trade breakdown items, (bb) Construction Costs actually incurred for the work in place as part of the Improvement as of the date of such inspection, (cc) the actual sum necessary to complete construction of the Improvement in accordance with the Plans and Specifications, and (dd) the amount of time from the date of such inspection which will be required to complete construction of the Improvement in accordance with the Plans and Specifications. Borrower agrees that the estimate of the Supervising Engineer of the

22

then percentage of completion of the Improvement, and the allocated cost therefor, shall be final and conclusive.

(b) Prior to each advance the Title Company shall have issued (i) a continuation of title showing title to the Mortgaged Property to be vested in the Borrower and no exceptions to the title of the Mortgaged Property other than those exceptions previously approved by the Lender in writing, and (ii) its endorsement insuring the priority of the lien of the Mortgage, subject only to exceptions previously approved by the Lender in writing, for the full amount of each such Loan advance and all previous Loan advances made pursuant to this Agreement or the Note. If required by the Lender, such continuation of title shall contain affirmative insurance that covenants and restrictions, if any, reported against the Mortgaged Property have not been violated by the Improvement. If required by the Lender, the Survey shall be updated to a date not more than 15 days prior to the date upon which each such advance is to be made showing a state of facts satisfactory to the Lender.

23

(c) Prior to the time of each advance after the first advance hereunder, the Borrower shall, upon request of the Lender, furnish the Lender with evidence satisfactory to the Lender, showing payment of all bills and charges for which advances have previously been made, including, but not limited to, payments made under the contract with the General Contractor and payments made with respect to Other Project Costs.

(d) The Borrower shall, if required by the Lender, deliver to the Lender a written statement or statements executed by each subcontractor working on the Improvement on behalf of the General Contractor certifying that each such subcontractor has received payment in full of all monies owed to each such subcontractor by the General Contractor for which advances have been previously made pursuant to this Agreement.

(e) The Borrower shall have delivered to the Lender all necessary certificates, authorizations, permits and licenses required by the Governmental Authorities to permit the construction and completion of the Improvement.

24

(f)  The    Supervising  Engineer  shall  have  been furnished  and  shall  have  approved  all  shop  and  other related  drawings  used  in  connection  with  the  Plans  and Specifications.

(g)  The  Supervising  Engineer  shall  be  of  the opinion  that  the  Improvement  can  be  completed  by  the Completion  Date.

(h)  No  default  or  Event  of  Default  exists  under this  Agreement,  the  Note  or  the  Mortgage  or  the Consolidation  and  Extension  Agreement,  if  any.

(i)  The    Mortgaged    Property  is  not  in  a materially  damaged  condition.

7.  <u>Final    Advance</u>.  For  the  final  advance,  in addition  to  fulfilling  each  of  the  conditions  set  forth  in paragraph  6  of  this  Schedule  I  and  in  paragraph  25  of  this Agreement,  the  Borrower  shall  also  have  delivered  to  the  Lender (i)  a  certificate  of  final  completion  from  the  Supervising Engineer  certifying  that  (a)  the  Improvement  has  been  completed in  accordance  with  the  Construction  Contract  and  the  Plans  and Specifications,  and  each  item  included  within  the  Improvement is  in  operating  order  for  its  intended  purpose  and  (b)  all  work has  been  completed  for  the  dismissal  of  all  Building  Department violations,  or  other  violations,  against  the  Mortgaged  Property and  (ii)  evidence  satisfactory  to  the  Lender  that  the  legally

collectible rents at the Mortgaged Property have been set at not less than the Rental Minimum defined in Exhibit B, without concession or rebate of any kind.*

8. <u>Contracts, Purchase Orders</u>. The Borrower, if requested by the Lender, shall deliver to the Lender and the Supervising Engineer copies of all contracts and purchase orders now or hereafter entered into by the General Contractor or the Borrower with subcontractors and materialmen for work and materials required in connection with the construction of the Improvement.

9. <u>Limitation on Advances</u>. The Lender shall not be required to make any advance of the Loan if (a) the portion of such advance to be applied towards Other Project Costs, plus the aggregate of all other sums previously advanced hereunder for Other Project Costs, is greater than the aggregate of Other Project Costs actually incurred and paid for by the Borrower, or (b) the portion of such advance to be applied towards Construction Costs, plus the aggregate of (i) the total of all advances of the Loan previously made hereunder for Construction Costs, (ii) the Borrower's Equity Requirement, and (iii) the

---

* The amount of the Final Advance will be less the punch list escrow to be retained by the Lender ("Completion Advance") which amount shall be whatever is deemed appropriate by the Lender in its sole discretion to insure completion of the punch list and less such amounts to be retained by the Lender pursuant to paragraph 14 below.

Retainage, is greater than the aggregate of Construction Costs (as estimated by the Supervising Engineer) actually incurred for work in place as part of the Improvement. In addition, the Lender shall not be required to make any advance of the Loan if, in the opinion of the Supervising Engineer, the balance of the portion of the Loan allocated toward the payment of Construction Costs after the making of such advance is less (the amount by which it is less being hereinafter called the "Deficiency") than the actual sum, as estimated by the Supervising Engineer, which will be required to complete construction of the Improvement in accordance with the Plans and Specifications.

10. <u>The Borrower's Failure to Cure</u>. Anything in this Agreement or any other agreements made with respect to the Loan to the contrary notwithstanding, if the Lender does not make an advance of the Loan pursuant to the provisions hereof because any condition set forth herein for the making of such advance by the Lender shall not have been satisfied for a period of thirty (30) days after an advance of the Loan is requested by the Borrower, then the failure to satisfy such condition shall be deemed an Event of Default (as defined in Section 11 of this Agreement). In addition, it shall be an Event of Default if the Borrower shall not deposit with the Lender an amount equal to the Deficiency within ten (10) days after the Lender shall

notify the Borrower of the Deficiency, specifying in such notice the amount thereof. Any amounts deposited by the Borrower with the Lender to pay the Deficiency shall not bear interest and may be commingled with the general funds of the Lender and shall be applied by the Lender as the Lender shall direct, to pay Construction Costs and Other Project Costs as construction of the Improvement progresses. If an Event of Default shall occur and be continuing, the Lender, in addition to all other rights which it may have, shall have the unconditional right, at its option, to apply, in whole or in part, any amounts deposited by the Borrower with the Lender with respect to the Deficiency, to the payment of the indebtedness evidenced by the Note and secured by the Mortgage in such order and priority as the Lender shall deem proper.

11. _The Lender's Approval of Work_. Anything in this Agreement or any other agreements made with respect to the Loan to the contrary notwithstanding, any advance of the Loan or approval given by the Lender, herein, or therein, whether or not before or after an inspection of the Improvement by the Supervising Engineer or otherwise, shall not be deemed to be an approval by the Lender of any work performed thereon or approval or acceptance by the Lender of any work or materials done or furnished with respect thereto or a representation by the Lender as to the fitness of such work or materials.

28

12.  <u>The Lender's Discretion</u>.  At the option of the Lender, the Lender may (a) make advances of Loan proceeds which have been allocated for Construction Costs incurred in connection with the construction of the Improvement in amounts greater than or less than the amounts set forth for the approved trade breakdown items and/or for items which are not approved trade breakdown items and (b) make advances of Loan proceeds which have been allocated for Other Project Costs for Construction Costs incurred in connection with the construction of the Improvement, and any amounts so advanced shall be deemed to have been advanced in pursuance and not in modification hereof and shall be deemed to be an amount advanced for Construction Costs.  Any provision or condition of this Agreement that requires the Lender (a) to make advances of the Loan on the basis of the approved trade breakdown items and the Schedule of Other Project Costs, or (b) to make advances of Loan proceeds allocated for Other Project Costs only for Other Project Costs or to make advances of Loan proceeds allocated for Construction Costs only for Construction Costs is a condition or provision imposed hereunder solely and exclusively for the benefit of the Lender and no other person or entity shall be entitled to rely on any such condition or provision as imposing an obligation on the Lender to make any advances of the Loan in accordance with the approved trade breakdown items

29

EXHIBIT A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the Westerly side of 20th Avenue with the Southerly side of 51st Street;

RUNNING THENCE Southerly along the Westerly side of 20th Avenue, 100 feet 2 inches to the center line of the block;

THENCE Westerly and parallel with 51st Street, 118 feet 8 inches;

THENCE Northerly and parallel with 20th Avenue and part of the distance through a party wall, 100 feet 2 inches to the Southerly side of 51st Street;

THENCE Easterly along the Southerly side of 51st Street, 118 feet 8 inches to the corner, the point or place of BEGINNING:

Said premises being known as 1974 51st Street, Brooklyn, New York

Premises: 1974 51st Street,
Brooklyn, New York

## EXHIBIT B
### DEFINITION OF CERTAIN TERMS

As used in this Agreement, including the schedules and exhibits attached hereto, the following terms shall have the following meanings:

1. <u>Improvement (including equipment to operate the improvement and off-site work, if any)</u>:

   Renovation of a one four-story non-elevator apartment building containing 47 living units.

2. <u>First Building Loan Amount</u>:   $  165,000
   <u>Second Building Loan Amount</u>:   $1,475,000
   <u>Third Building Loan Amount</u>:   $1,069,117

3. <u>Aggregate Loan Amount</u>:   <u>$2,709,117</u>

4. <u>Construction Contract</u>:   Dated <u>November 24, 1987</u> and between <u>1974 Realty Associates</u> (Owner) and <u>R & R Contracting Company, Inc.</u> (Contractor).

5. <u>Plans and Specifications</u>:    See B-1

6. <u>General Contractor</u>: R & R Constracting Company, Inc.

7. <u>Supervising Engineer</u>:   Peter Franzese

8. <u>Long Term Lender</u>:  (1) The New York City Community Preservation Corporation and (2) The City of New York, acting through its Department of Housing Preservation and Development ("HPD")

9. <u>Completion Date</u>:  November 29, 1988

10. <u>Rental Minimum</u>:    $248,256 from apartments

11. <u>Refinancing/Acquisition Amount</u>:    0

12. <u>Borrower's Equity Requirement</u>:   0   ~~865~~

13. <u>Construction Sum</u>: $2,216,135

14. <u>Sum of Other Project Costs</u>:   See B-3

15. <u>First Loan Allocation Fraction</u>:   6.09 / 100

    <u>Second Loan Allocation Fraction</u>:   54.45 / 100

    <u>Third Loan Allocation Fraction</u>:   39.46 / 100

16. <u>Aggregate Equity Investment</u>:   $347,883

EXHIBIT B - 1

SCHEDULE OF PLANS AND SPECIFICATIONS

PREMISES: 1974 51st Street
Brooklyn, New York

DATE:    November 24, 1987

These Specifications are contained in the Construction Contract
described in Item 4 of Exhibit B, and consist of an Index Page and
Sections 1a through 16a which appear on Pages 1 through 8 dated April
17, 1986, revised October 30, 1986 plus addendum 1 dated May 12, 1987,
Addendum 2, dated November 20, 1987, and Addendum 3 dated November 23,
1987.

| SECTION | ITEM | PAGE |
|---------|------|------|
| 1a | SPECIFIC REQUIREMENTS | |
| 1b | SUBMITTALS | |
| 2a | DEMOLITION | |
| 2b | SITE WORK AND LANDSCAPING | |
| 3a | CONCRETE WORK | |
| 4a | MASONRY | |
| 5a | MISCELLANEOUS METALS | |
| 5b | METAL STAIRS | |
| 5c | FIRE ESCAPES | |
| 6a | ROUGH CARPENTRY | |
| 6b | FINISH CARPENTRY | |
| 7a | CAULKING | |
| 7b | INSULATION | |
| 8a | BUILT-UP ROOFING AND FLASHING | |
| 8a | METAL DOORS, WINDOWS AND FRAMES | |
| 8b | WOOD DOORS | |
| 8c | FINISH HARDWARE | |
| 8d | ALUMINUM WINDOWS | |
| 8e | WEATHERSTRIPPING | |
| 9a | DRY WALL | |
| 9b | CERAMIC TILE, QUARRY TILE, AND BATHROOM ACCESSORIES | |
| 9c | RESILIENT FLOORING | |
| 9d | PAINTING | |
| 9e | WOOD FLOOR | |
| 11a | REFRIGERATORS | |
| 11b | KITCHEN RANGES | |
| 11c | KITCHEN CABINETS AND COUNTERTOPS | |
| 11d | MEDICINE CABINETS AND MIRRORS | |
| 11e | CHAIR LIFT | |
| 11f | COMPACTOR | |
| 15a | HEATING AND VENTILATING | |
| 15b | PLUMBING | |
| 16a | ELECTRCAL | |

EXHIBIT B -2

TRADE BREAKDOWN TOTAL

DATE:            November 24, 1987

BORROWER:        1974 Realty Associates

PROJECT:         Rehabilitation and Improvements of Building at 1974 51st
                 Street, Brooklyn, New York

CONTRACTOR:      R & R Contracting Company, Ind.

TOTAL:           $~~2,217,000~~ 2,216,135.00    SIXTEEN THOUSAND ONE HUNDRED THIRTY FIVE DOLL

                 TWO MILLION TWO HUNDRED ~~SEVENTEEN DOLLARS~~

EXHIBIT B - 3

SCHEDULE OF OTHER PROJECT COSTS

DATE:        November 24, 1987

PROJECT:     Rehabilitation of Building at 1974 51st Street,
             Brooklyn, New York

ITEMS

Contingency:   $178,595

Other Costs:   $149,598

<u>Other Costs</u>  The construction loan shall include advances for the
following Other Costs in not more than the amounts specified:

| | | |
|---|---|---|
| (a) | CPC Commitment Fee | $ 42,091 |
| (b) | Title Insurance | 9,384 |
| (c) | Mortgage Recording Tax | 60,955 |
| (d) | Construction Interest | 37,168 |

Upon construction loan closing, advances may be made to pay for or
reimburse the Borrower for any of the enumerated items (a) - (c). With
respect to item (d), the Construction Loan shall include advances to
pay for Construction Interest. Advances shall be made monthly to
reimburse Borrower after payment has been received for each
construction interest billing. Reimbursement shall be equal to 100% of
payments made and shall be advanced at the time of further construction
advances, if any; provided however, that in no event shall advances for
construction interest exceed an aggregate  <u>$37,168</u>  . Any
construction interest in excess of this amount shall be the sole
obligation of the Borrower.

To the extent that advances for the foregoing <u>Other Costs</u> are less
than $149,598, the loan to be made by HUD pursuant to the HPD Third
Mortgage and the portion thereof for <u>Other Costs</u> shall be reduced
accordingly.

EXHIBIT C

AFFIDAVIT PURSUANT TO SECTION 22 OF THE

LIEN LAW OF THE STATE OF NEW YORK

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

      JONATHAN POOLE, being duly sworn, deposes and says: I am the President of PR&PR REALTY CORP., a General Partner of 1974 REALTY ASSOCIATES, the Borrower mentioned in the within Building Loan Contract.

      The consideration paid, or to be paid, by the Borrower to the Lender for the loan described therein is $42,091.00, and all other expenses incurred, or to be incurred, in connection with said loan are as follows:

Examination and insurance of title; recording fee and Mortgage tax: $70,339.00

Architects', engineers' and surveyors' fees: –0–

Appraisals: –0–

Fire Insurance: –0–

Commitment Fee: $42,091.00

The Lender's Engineer and legal costs: –0–

SONYMA fees: –0–

Contractor's fee: –0–

General Contingency: $178,595.00

Professional Engineer: –0–

Sums paid to take by assignment prior existing mortgages which are consolidated with building loan mortgage: –0–

Sums paid to discharge or reduce indebtedness under mortgages and accrued interest thereon and other prior existing encumbrances: –0–
Acquisition Cost: $164,789.00
Taxes, assessments, water rents and sewer rents paid (existing prior to commencement of improvement): –0–

Freddie Mac Fees for Permanent Loan: –0–

J-51 Fee: –0–

Construction Contingency:
$

Construction Loan
Interest:  $37,168.00

Building Loan
Interest:  -0-

Legal Fees:  -0-

and that the net sum available to the said Borrower for the Improvement is $2,216,135.00.

This statement is made pursuant to Section 22 of the Lien Law of the State of New York.

The facts herein stated are true to the knowledge of the deponent.

SWORN TO BEFORE ME THIS
24 DAY OF NOVEMBER, 1987

Notary Public

SAMUEL H. KLAGSBRUN
Notary Public, State of New York
No. 31-4760502
Qualified in New York County
Commission Expires May 31, 1988

2

**Exhibit B**

#388

---

## 1974 REALTY ASSOCIATES

TO

## THE COMMUNITY PRESERVATION CORPORATION

---

### FIRST BUILDING LOAN NOTE

---

Dated:           November 24, 1987
Premises:        1974 51st Street
                 Brooklyn, New York

Principal Amount:    $165,000.00

Block:   5460

Lot:     35

---